Good afternoon. Illinois Appellate Court's First District Court is now in session, the First Division, the Honorable Justice John Griffin presiding, case number 1-9-0-3-1-7, People v. Land of Lincoln Development Company. Welcome. If the attorneys will be arguing, please state their name and spell their last name for appearing for Donald Clark, Leslie Clark, and Land of Lincoln Development Company, the owners and the accomplices in this consolidated appeal. Ms. Wunder, are you going to be arguing? Yes. My name is Laura Wunder, W-U-N-D-E-R. I'm an Assistant Attorney General here on behalf of the people who are the FLEs. Okay. Sorry. Mr. Prendergast? Good afternoon, Your Honor. Richard Prendergast for Lincoln Limited and John Einolder. Both are appellants. As you know, there are two sets of appellants. This is a consolidated appeal. Okay. Have we come to any agreement with regard to time? Normally, it's, I guess, 20 minutes. Your Honor, yes, we have. Mr. Prendergast and I have discussed this. We've asked that each appellant be given 15 minutes time instead of collectively 15 minutes. I want to emphasize that this is not a combined argument. The arguments of the appellants are very divergent and the interests are adverse. We'd also ask with the court's indulgence that we be each given five minutes time for rebuttal. If that's acceptable to the court. Do either of my fellow justices have an objection to that? How about 10 and 5? But, you know, it'll be a real 15 minutes, not a lawyer's 15 minutes. Okay. Yes, Your Honor. And then, Ms. Wunder, do you need anything extra? No, I believe you initially said that it would be 20 minutes for the appellate. Well, normally both sides get 20 minutes, is what I said. Okay. I believe that I can wrap up within 20 minutes. If there is considerable discussion by the two appellants, perhaps I could have an extra moment or two to wrap up. Okay. Thank you. All right. Mr. Cheap. May it please the court. As I said, my name is Jeffrey Cheap and I represent Donald Clark and Land and Lincoln Development Company. This case has been pending for 16 years. I suppose I'm a bit of a glutton for punishment. And then I'm asking the court to remand it for a trial on the issue of penalties and the appropriate remedy. And I may very well be back here in 2022 on the third appeal. During those 16 years of litigation, the owners have been in lockstep with the state of Illinois in their efforts to shut down the site with two significant exceptions. The first occurred in January of 2011 on the eve of trial before Judge Preston, where we were going to address the issue of remedy and penalties. And all the parties have recognized the trial was necessary and stipulations have been filed. At that time, the state claimed that Judge Bronstein in August of 2007 could already rule on the issue of the liability of the owners. And the state backed that argument up by pointing to the decision by this court in the first appeal, People versus Determination of Liability of the Owners. The state was wrong, and that has been confirmed multiple times on that point. The second disagreement with the state brings us here today. For the second time, the state tries to say something happened that did not. The state argues that this court decided a trial was not necessary on the issue of the remedy and penalties in the second appeal. Mr. Gee, where did, in the record, did you ask for a trial alone? Where is it? Did you have a motion? Repeatedly, Your Honor. In the responses to the motions for permanent injunction and penalties, we recounted the history of the proceedings. Did you file the motion? No, we didn't file a motion. We filed a response. Well, you didn't ask for a trial. My understanding is that from the state that the record doesn't reflect that you asked for a trial. I might be incorrect in there, but I believe that that's what... Your Honor, I disagree. We did ask for a trial at the end. What did the judge rule? He ruled that he was in his December 28 ruling in his December 13, 2018 ruling. In paragraph three, the judge ruled that he's been directed by the appellate court not to hold a hearing, that he has no choice because of the decision in the second appeal. That's right. Where before that? We're past that situation. We have to enforce an order, an appellate decision from the number two, what we call number two. It seems to me we're past the opportunity for trial. Well, Your Honor, in my reply for you, I give a specific citation. Of all the times that we've asked for a trial. In the last page, the last section of that portion of my reply brief, I set out in bold our prayer for relief saying, we are asking... A trial it must be, is how I concluded my brief. A trial it must be on the penalties and on the appropriate remedy. I said that repeatedly. Why would the appellate court decision not say anything about a trial? The appellate court decision is being misinterpreted by the circuit court as precluding a trial. The language in paragraph... I mean, it sounds pretty clear that looking for remedial relief here. Well, the appellate court's decision here before the appellate court was the issue of the liability of the owners. That was the only issue which the court had jurisdiction under the 304A finding. And the court goes through in three different elements of the opinion in addressing the issue of liability. They address the issue of liability. Are the owners an operator under section 22A of the act? No, they were not. The bulk of the opinion addresses the issue of whether they allow disposal to occur. And that addresses all of their efforts to prevent and shut down the operation. And the court concluded under 22A, they did not allow disposal. Then at the end of the opinion, the court addresses the issue under 22E of the statute. 21E, excuse me. And addresses the question of whether the owners had allowed the waste that had been disposed of by the operators to be stored or abandoned on the property. And the court said because the owners failed to remediate, failed to excavate and remove that material, they were in violation of 21A and allowing illegal waste to be stored and abandoned. Our position is that whether they were found liable for allowing the disposal under 21A or being an operator under 21A or allowing waste to be stored or abandoned under 21E, once the determination of liability was made, that was the extent of your jurisdiction. At that point, the issue should have been remanded to the trial court to deal with the issues that remained and were expressly reserved by the state in their motion for a 304A finding. In their motion, they said what remains before the circuit court is the issue of penalties and the remedy. So that is the issue that we've been struggling with, is that the court used the term or used the wording that if the operators fail to remediate, then the owners shall remediate. And Judge Atkins interpreted that in a way, well, there's no need for me to have a trial. I can't have a trial. I have an order. What would the trial have covered in your mind? Well, a wide variety of issues, Your Honor. We set some of those out in our medals to the circuit court and in our brief. I'll give you a few examples. It's a hundred million dollars to excavate the pot that's stipulated and agreed to by the parties. It would take eight months to remove this material. The waste has been determined to be non-hazardous. It does not have any toxic materials in it. It's clean material. The cost and the benefit of moving that, taking waste that is above ground, out of groundwater, putting it in groundwater is an issue that we have also raised in our brief. The feasibility, the relative balance, and at trial, we also, the fundamental issue we wanted to address, and that we started, we were on the eve of addressing Your Honor in January of 2011 before Judge Preston, was whether we had acted willfully, whether we had intentionally violated the act. And therefore, whether under the Rosenwinkel decision in the second district, the court of equity had the authority to balance the equities and look at the relative equities of the operators versus the owners. All of the things that we had just been discussing that we had discussed in the second appeal about why we had not allowed the disposal because all of our efforts to shut down the operation and working with the state. All of those factors of our relative culpability to the operators and that we did everything we could to stop this waste going in. Very similar to the circumstances in Rosenwinkel where we did not willfully violate the act. All of those issues we wanted to have a hearing on. They were teed up for a hearing. We had trial memoranda drafted. We had stipulations submitted. And the stipulations also addressed the fact of what was the role of the owners. We had stipulations. They were not involved in operations. They had limited control over contracting with those who before January of 2011 when this was queued up for trial. So the issue of as a threshold matter, your honor, whether or not we willfully violated the act and whether a court had the equitable jurisdiction to balance the equities as to us versus the operators. That would be the primary issue and was briefed extensively before January 2011. And then if this is statutory injunction, so we don't need to balance any equities, right? Well, that's where we disagree, your honor. Well, you disagree on the interpretation of a case. One case and it relies in Midland, which doesn't seem to apply when you read Midland. So doesn't seem to be much of a read there for you to rely on. Well, I disagree, your honor. We have not found one case that says where there is a violation of the act. A court of equity is without jurisdiction to balance equities and shall as a matter of law issue a mandatory injunction. That's what the statute says. We follow the statute. The statute says you could have a permanent or preliminary injunction. Case law has said this after Cerrone. And so I don't see any question there. Case law seems to be pretty clear on it. Well, I respectfully disagree, your honor. I think that a court of equity, there is a fundamental issue of separation of policy of a court of equity has traditionally balanced equities. Traditionally, it doesn't have to in every case. Just because it's in the chancery division, it doesn't have to be in a chancery division necessarily. In our court system, that's where these cases go, a chancery division. But it's still, we have a statute. The statute is pretty clear as to where, what is to transpire here. And the case law, as I read it, the only case that might be a little out of joint is this Rosenwinkel case based upon the decision in Midland, which is apparently misinterpreted. So otherwise, I don't see any support for your position. Other than that one case, where's the support for your position? Well, let me interrupt that with a question. Your position is that you should have had, you were entitled to a trial on whether penalties and injunctive relief should have been issued against you and to what extent. Is that correct? That is correct, your honor. And you would have argued that no fine, no penalty, no nothing. And we had no responsibility to remove it. Not necessarily, your honor. Not necessarily. No, I may very well argue that, yeah, we have some responsibility. We're liable and there has to be something done with this pile. You can't just ignore it. You have to do something. So we would have had to develop, fashion a remedy and have engineers present testimony. How do you deal with a pile like this? What do you do? Should we have monitored groundwater? Is there any methane gas to be monitored? No. We've determined that there isn't a groundwater issue. So maybe we should monitor for a couple more years and then cease that. What do we do to maintain the vegetation and make sure that there isn't any runoff from this type of landfill? So we could have fashioned a remedy to protect the public health and the environment. We weren't saying that we didn't have a responsibility to do anything. We were saying that there were alternatives to spending a hundred million dollars, which no one has, to move this landfill to a different location. And this is very common in the environment. I understand that argument in light of the fact that under the order, the court and the IAPA have oversight over this. So it's not just happening without any supervision at all. Of course not, your honor. Of course not. It would be pursuant to a consent order. It sounds like the horse has already left the station with regard to the remedy. Well, your honor, the alternatives that I was suggesting to you would be presumably by agreement with the state in the form of a consent order for fashion with the participation of the state. And we would arrive at what is the appropriate response to this landfill. And I'm sure this... You have to get involved. The IEPA, you can go to them right now. You want to negotiate with them? Go ahead. Nobody's stopping you. Well, your honor, it takes two to negotiate. You don't want to negotiate? Do they have to? I mean, they have supervision over this. You're not just going out there and doing it on your own. Come back to court. So why do we got to get involved? Well, the court's involved, your honor, because they've invoked your jurisdiction. They've invoked your policy of equity. What would a trial... I mean, I just don't see where a trial is moving this along after, as you said, 16 years. Well, the trial would look at the cost and the benefit of different remedial approaches. If this site had drums of hazardous waste in it, there would be one approach. If it had municipal cell waste that generated methane, you don't have this. Many of these facts are already agreed to, so... Well, the facts were agreed to on the eve of trial. And we were poised to have a hearing on what do we do with this pile? We were all queued up for that in January of 2011. And since then, there's been another decision by the appellate court. As I said, the horses left the station. You wanted to raise that, you had your opportunity. We're way past it. That's nine years ago you're talking about. We're talking about what happened in 2018. Well, your honor, we couldn't have raised it, and it wasn't raised in the second year. You're about to have a trial. Well, they're all raised in the trial memorandum. All these issues I'm describing to you are in the trial memorandum that we were poised to have. And then when the issue arose, well, wait a minute, are we liable? No one's determined that we're liable. And Judge Preston said, you know, I think you're right. We need to make a determination whether you're liable. We know the operators are liable. And then we went off in a different direction, because Judge Preston agreed that Judge Brownstein did not find us to be liable. In fact, then Judge Atkins decided on a motion for cross motions for summary judgment. We were, in fact, not liable. And that went up to the appellate court. And that was the only issue before the appellate court, whether or not we were liable. And the motion for the 304A finding expressly said, the state's motion, the issue of penalties and the issue of the appropriate remedy stays here with the circuit court. And you ruled on the issue of liability. You said we were liable. And it should have come back to its posture of where it was before Judge Preston in January of 2001, ready for trial, with stipulations, with trial memorandum, with a list of witnesses, a list of all the exhibits. We identified all the issues, some of which we've just touched on. There were a whole series of issues that we haven't discussed that were to be heard at a trial with witnesses and with documents and with experts. That's never happened, Your Honor. Counselor, I think your time is up. No, no problem. My time is up? Yes. If I may ask a question, Mr. Chief, the status of the order now is, I'm going to try to summarize, is the operator is to remove the pile. And if the operator doesn't, the owner is to remove the pile. And the removal of the pile will be under the supervision of the Illinois EPA. Is that it? That's correct in part, Your Honor. That was... What's missing? Just real quick. The operator did not remove the pile and therefore we are being told to remove it. Right. Under the supervision of the Illinois EPA. Yes, everything is under supervision of the Illinois EPA. There are more aspects of the order that deal with groundwater monitoring and a whole other range of issues. It's a very lengthy order. It's all under the supervision of the Illinois EPA. And is any part of that now subject to negotiation between the owners and the EPA? Or is it etched in stone that it has to be under the terms as written in the order? I have reached out to the Attorney General to try to settle the case and come up with an alternative. That's not on the record. My question is, if you complied with the order entered by Judge Atkins, is there any room for negotiation with the Illinois EPA as to how the removal takes place? Or is it order to be done as written in the order? It's the letter, Your Honor. It has to be removed. And we have to present a plan in the order. Yes, we have to present a plan to the IPA of how we're going to remove it. But it's got to be... We have to pick it up and take it somewhere. Right, okay. Thank you. Thank you. Thank you. Prendergast? Hey, please. The court, Richard Prendergast for Lincoln Limited and John Einolder. This is the third time this case has come before this court, as you know. We were not parties to the second appeal. Nevertheless, the circuit court interpreted this court's opinion in that appeal as directing that without any further hearing, mandatory injunction should issue or require the operators, as I said, we're not parties to the appeal to begin with, to perform what is estimated to be $110 million or $100 million deconstruction of the guild over the next seven years, an utterly impossible task for an individual who's over 70 years old, and his now defunct corporation, which existed only for the purposes of this particular project. So because of that context, and the case presents a number of important questions of law, without limitation, they include a mandatory injunction that clearly cannot be performed to constitute a valid and enforceable order. Can and have courts become strict of their longstanding power to determine whether injunctive relief is appropriate, simply because the statute says that the agency or the Attorney General may in action seeking prohibitory and mandatory injunctive relief. In other words, does this court have no authority to examine the facts? It gets around to the hearing issue to some extent. May an amendment to a statute, and I'd like to start on this if I might. May an amendment to a statute that authorizes mandatory injunctive relief be retroactively applied to conduct that predates the amendment? Supreme Court has already answered that question in the negative. The state wants you to ignore it. That was the... I don't think the state wants us to ignore it. That's not what they're saying. They're saying that it was a continuing violation, and the violation continued after the amendment of the statute. That's a different situation. I think that's a distinction without a difference. Because the retroactivity issue, Your Honor, applies to the conduct of the defendant. If the defendant performs an act on day one, and the statute is changed on day two, and then the defendant continues to act, that doesn't mean that the sanction that was composed under the amendment on day two can be applied to activity of the defendant. On day three, it's under the new act. This case, they had every opportunity to stop in 2004. They didn't. I don't understand in this Supreme Court case, it seems to me that the fact that they continued, that's liability. Just because you started in one spot, the act changes, and then from there on, you continue. We're just talking from then on, from 2004 to 2007. It continued. It continues to this day. It's still there. That's correct. It's still there. At the time that amendment was passed, that was the amendment that was subject to the Tri-State, the People v. Tri-State case that was before the Illinois Supreme Court. At the time that amendment was passed, this hill was 73 feet high. Today, it's 85 feet high. The state's argument is, because you put 12 more feet of clean construction and demolition debris on it, all of your prior conduct is subject to the change in the law. That's not what the state says. What the state talks about is the height, the amounts, and so forth. They said it's almost over 50% came after the amendment. That's what they say in the brief. What you're arguing is, because the statute was changed, they should have immunity? Is that your argument? It's not a question of immunity. If it's not immunity, what is it? They're not let's suppose the statute had never been amended. Would there be any authority that would permit the mandatory injunction to remove the hill? The answer for the Tri-State case is no. That's black letter, 7-0 law of the Illinois Supreme Court. Because they added 12 feet to the hill, the state now argues you can apply that change in the law to conduct the predated the sanction. That sanction was determined, that remedy, if you will, was determined by the Illinois Supreme Court to be substantive law, and the amendment was interpreted to be a change in substantive law. You cannot make a change in substantive law and apply it to conduct the predated change. That's the holding in that case. Your position is, at best, the circuit court can only order you to remove 12 feet? That's correct. I mean, that doesn't make any sense. No, it doesn't. And as a Supreme Court ruling, they're referring to, it just seems, again, they're continuing violation. They just added and added and added. Now, whether it's 12 or 1 feet or 100 feet, it's not a measurement thing. Why would it be? Where does it say it should be by pounds or by height? Does it say that anywhere? No, it has to do with the conduct. What kind of conduct did it after the change? What conduct was subject to a mandatory injunction? Only the conduct that co-stated that change in the law. And to your point, it doesn't make any sense. I agree with you. Because if you take the top 10 or 12 feet of that hill off, what you're going to do is strip away the trees, the bushes, the shrubs, the grass. There's an exhibit in this case that we referred to in our opening brief. I'm trying to remember exactly where it appears. It's C10844V4. Sorry, I can't hand it to you. But it's an exhibit that the state used in this case. And it's an exhibit that identifies the dates on which there were various elevations of the hill. And at 73 feet, it was August 6, 2004. By April 23, 2009, it was 85 feet. If you take the top 12 feet of this hill off, your honor, you're going to strip it of all of the growth that keeps the hill capped. You're going to create erosion. You're going to make it be an environmental disaster. Right now, this hill is not an hazardous. Nobody's complaining that this hill is toxic. Nobody's complaining that the water is bad. It's just a big green hill. It was another violation by this individual with regard to not getting a permit. The law requires a permit. That's true. And the waste disposal is highly in this state. It has been for some time. And it's supposed to be, interpret the act for its purpose. The purpose is to get rid of that unlawful waste. No, the purpose of the act is to get a permit to determine whether you can't. I didn't get a permit, so it's too late now. You didn't get a permit, but we're not talking liability. We were determined to be liable in the 308 appeal years ago. We never have had a hearing on remedies. The remedy is a separate part of the case. That remedy has to do with whether or not you can order mandatory injunctive relief. And under the state's interpretation of the law, you don't have any choice. You just have to turn the gavel on the bench over to the attorney general. They can hand you any injunction order they want, and they can say the statute provides that we may seek injunctive relief. Here it is. Can you imagine a statute that would say that the state may seek injunctive relief and no court shall quibble with the language of the proposed injunction? That's not what it says. I think you're exaggerating when you say nobody can quibble. The fact that they are seeking an injunction and have a right to it, there may not be any language. Judges always have discretion, and in this case would have discretion in how it's defined and what's being done. So I mean, I don't understand your argument that the court needs to accept anything the attorney general puts in front of his or her. The court literally rubber-stamped what PHE handed them. I don't think that's a rubber stamp. I think they can go through it. I think they can ask questions about it. But yes, they have to enjoy it. The remedy, they don't have a question on, but that's only part of the issue. I thought your argument had to do with the remedy, but now you're saying your argument has to do with what it says in that injunction? What objections did you make to that? Well, the injunction is the remedy. Well, but the wording in the injunction, were there any changes made? Was one change made in the wording of the injunction? I don't believe a comment was changed. Did anybody object? Well, I mean, we certainly objected. I wasn't even, my client was not even a party to the appeal, the second appeal. And counsel is correct that Judge Atkins, when we appeared before Judge Atkins and said, you know, this, we can't remove this hill. It's impossible to do it. Most of the hill was built before they amended the statute. We made all these arguments, both orally and in writing. Judge Atkins answer to respectfully was, what do you want me to do? The appellate court said, enter the injunction to remediate the hill. I interpret remediation to mean remove the hill. So I have to follow what the appellate court tells me. There was no examination of the facts, the consequences, or all of the things that would be developed in the course of a hearing. And while I think that all the hearing would demonstrate is what I'm saying to be the case, which is the impossibility of removal, the retroactivity issue with respect to how much of the hill was there beforehand, and a variety of other things. The fact of the matter is there was no hearing held, precisely because Judge Atkins felt he had no choice. Now, this is a case that came back from the appellate court to Judge Atkins. We weren't even involved in that. That case went up on a 304A appeal against the owners, involving the owners, with respect to the question of their liability. It wasn't even supposed to be a question of remedy. We weren't involved in that. Our liability had been determined under that 308 appeal. So we never had a word to say in the appellate court. We weren't given an opportunity to have a word to say in the circuit court. And in the meantime, the Attorney General comes in and argues, you don't really have a choice. If the statute says that the agency or the Attorney General may seek injunctive relief, declare whether it's prohibitive or mandatory, if that's what the statute says, the court has no choice. The court has to do that. And in this case, what the court did was follow the argument and then say, give me the injunction. The injunction was given to the court, the court signed it. It's a very lengthy document. There's a lot of material in it, a lot of requirements in it. We never had a hearing on one comment. So now, as Mr. Chief said, I'm not anxious to continue to go through this case forever. But the fact of the matter is, there's a certain requirement, as counsel put it, of separation of powers here, where the legislature cannot pass a statute that says the judiciary shall enter an injunction that the executive branch must enter. And that's the end of the discussion. And that's what happened here. And that leaks from that issue away from the retroactivity argument. I don't want to spend my last two minutes on retroactivity, because I've already beat us to death. But I will say this. There is a Supreme Court case that's very related to this case, and it involves this right, as the court is fully aware. And that case holds you cannot apply a remedy that is substantive in nature, which this is, retroactively, and that accounts for about 80% of the sale. And the order requires removal of the statute. There are a couple of other issues that I think are very important. Specifically, if you have a mandatory injunction that can't be performed, is that a valid and enforceable order? There should be no discussion on this subject. There is no question that either Mr. Jeep's clients, who are two elderly people who run a nursery nearby, and my client, who is in his 70s and poor health, there's no question that these defendants cannot perform this injunction. That we've cited the case law on that, Your Honor. You can't issue an injunction. What would be the consequence if we failed? Well, there'd be a rule of show cause, I suppose. And then the rule of show cause would be responded to by saying, it's impossible for us to do this. We can't do it. Therefore, you have no willful violation. You have no contempt of court. We're going around in circles here. We're talking about removing a hill that can't be removed by people who can't remove it. And on top of that, we're talking about a hill that is perfectly safe from an environmental standpoint, from water to the content of the material that was deposited there. It's all been inspected. They've had digs. They've had water inspections. To have a hill is benign. It's not harming anyone. That's not the point, as I understand it. Well, the point is we don't have a permit. Now we have a permit violation that generates a $6 million fine. So far out of line with every case on the books with respect to the amount of a reasonable fine. Not really. If you look at the case from Spring Court in 2013, it's not that out of line when you consider the amount involved in the Linwood case and the amount involved here. It's comparable. I truly think that the majority of the cases, let me leave it that way. I don't want to be absolute. The majority of the cases are, in this case, out of line with respect to the fine. And now you have two remedies. One is removal of the hill, which is impossible, and you have fines that are completely out of line. And then you don't have a hearing to determine the reason for the fines. I'm not suggesting, and I think you put your finger right on it, when you talked about the injunctive relief, because the statute doesn't say that the court has to rubber stamp. I think Judge Atkins felt he had to take what was given to him because of the appellate court order. But the statute doesn't say that. What the statute really says is, we're not going to weigh the traditional considerations that are weighed when you issue an injunction. You're going to look to see if the statute was violated. But then that doesn't take away from the court the authority to determine the nature of the injunctive relief if injunctive relief is going to issue. That injunctive relief could be, for example, that the parties have to monitor the site. They have to monitor the water. They have to cooperate and meet annually with the EPA. They have to comply with reasonable EPA requirements as they go forward. It does not require removing the hill. It cannot be done. And I think that I'm over my time. But I'll just say that I think it is a very significant and bad precedent to sanction an order that cannot be performed and that's undisputed in fines that are imposed without a hearing. And I respectfully request on the basis of our briefs and our argument this afternoon, in this case, reverse and remand this case in the circuit court. Thank you. Thank you. Ms. Warner? We're here to discuss the civil penalties and the injunction order. And I'd like to begin by briefly discussing the penalties and then move on to talking about the injunction. The penalties, of course, are reviewed under an abusive discretion standard, which is very deferential. There should be a hearing with regard to the penalty. Why shouldn't there be a hearing? There was a hearing with regard to the penalty. There was a paper hearing that involved comprehensive briefing. There was briefing? There was briefing. There were exhibits and documentary evidence in the records that were attached to people's briefs. So the owners that bring up this idea of, well, there should have been a trial. And just to clarify, the penalties and the injunctions get a different footing there. The owners did say in the briefing in the circuit court that they should be accorded some type of evidentiary hearing on the injunction for what they say the purpose of that would be to balance the equities. But penalties was not something that the owners ever addressed in the briefing. They actually said very little about penalties in the circuit court. And they did not ask for a trial on penalty as such. Penalties were not really addressed. They have raised the idea that somehow the people maybe agreed that there would be some type of in-person evidentiary hearing on penalties in prior filings. But that's inaccurate. There was never a filing where people insisted that penalties be disposed of by some type of in-person hearing versus a paper hearing that looks at all of the evidence of record. So when you say a paper hearing, well, you mean there was briefing? Yes. And exhibits, and somebody could attach an affidavit or transcripts from a deposition? And in particular, the owners have mentioned that there were trial stipulations. Because back in 2011, the case was heading towards a trial in the sense that there'd be some hearing before the then-judge. Those stipulations were very small. What was it that you were heading towards trial on? On the issues that remained in the case, which would be the adjusted release and the penalties. And it was thought that the owner's liability was resolved that turned out not through the then-judge decided. And that is how the case wound up in the appellate court. How does that affect the operator? So the operator really hasn't had their day in court. Because they weren't part of that. The operators were not a party to the second appeal, which is about the owner's liability. The operators don't say that there should be a trial on penalties either, because everybody had the opportunity to put in all the trial stipulations, all the documentary evidence on penalties was all before the court. And if anyone thought that the evidence of penalties was not sufficient, or something else was needed on penalties, or they wanted to use something that wasn't in the record, they had every opportunity to tell that to a separate court and say, well, we need something else here about penalties. And no one did that. And there was no reason for that, because all of that evidence was in the record. In fact, I just want to go back to the trial stipulations. Both the owners and the people basically said at that time, you know, let it be trial stipulations. We don't plan to call any witnesses. So it's not like there was some extensive trial contemplated, even at that time. And again, I think it's important that the injunction and penalties are separate. Right. The injunction and penalties are separate. So let's look at this. As far as the penalty is concerned, what you are saying is that both sides had their opportunity to make arguments before the court, present anything they wanted before the court. And that horse has left the station. Absolutely. If anything happens here, that penalty should be resolved and we should move forward. But let's go back to the question with regard to a trial, because the operators were not a party to the appeal. You know, they're on the verge of going to trial on the remedies. It goes up on appeal on an issue with regard to the owner. And all of a sudden, it comes down and they don't get their trial, but they're stuck with this injunction, which is mandatory. And they have nothing to say about it, because the judge says, oh, I'm required to do it in a case in which they did not participate. How can we justify that? Again, I think we're talking about the injunction. Injunction. The operators know the owners as for any different procedures regarding penalties. We're not talking about that. I took care of the penalties. You had a hearing. I'm talking about the injunction, which is part of it. With respect to the injunction, I would say that the circuit court was attempting to implement the appellate court's directions. But I think an important aspect that the circuit court also took into account in doing that was that neither the owners nor the operators presented any other detailed, thought-out plan to remediate the site for the court's consideration. So what the court was looking at is, here are these directions from the appellate court, and no one is telling me anything else besides the people who are saying, here's what we think should happen and why. But, again, shouldn't that be determined at a trial rather than, they don't have, shouldn't they have a say and have to put on some kind of evidence and they can have a hearing on some of these issues that Mr. Prendergast raised, again, particularly when, as to him and his clients, there was no opportunity for them to really do anything because it came back as the judge interpreted this appeal as saying, my hands are tied. But wait a minute, how can they tie their hands with somebody who never appealed? And it wasn't a party to that appeal. And all of a sudden, they're closed out. I mean, again, the operator and, you know, there's a difference here in their position with regard to that decision. But that's at the heart of what happened here. And the operator got whipsawed, that's one way to say it, maybe it's a little strong term, in that all of a sudden they find themselves tied foot to foot with the owner. I would say that they, both the owners and operators, if they had any other plan that they wanted the court to consider, they had the opportunity to present that. The state made its for why removal is the appropriate remedy here. What kind of proceeding was it? What motion was filed to make that determination? The state moved for mandatory permanent injunctive seeking removal of the waste and submitted a brief on why that is the appropriate remedy. We believe it is the appropriate remedy because it is the remedy that vindicates the purposes of the act and provides a complete remedy, brings the site into compliance with the act and sends the correct message to persons who are subject to the act about what is expected and required and prevents unfair competition from owners and operators who do not abide by the comprehensive regulatory framework. So we've presented all of the reasons why this was warranted as well as a detailed order for the court's consideration and in response to that, neither the owners nor the operators presented some other thought-out plan for the future of the site for the court's consideration. So your position of those people is you don't need a trial? Correct. Our position is the record as it stands has everything in it that would allow this order to be affirmed and this order should be affirmed because removal is the appropriate remedy. It was what the appellate court... Let me interrupt you because we could be here all day. I think we all know where you're going. Is the remedy that you proposed, if it's assumed that it costs over a hundred million dollars to remove a pile of debris that is secure and non-toxic, not posing a threat to the environment, is that penalty on its face something that can be enforced or is it unreasonable because of the cost involved? What good does it do to incur that cost, which nobody can, if it cannot be accomplished? Isn't there at least some room for more discussion or further alternative remedy that can be imposed by a mandatory injunction, altering the terms of what the state and the people provided? Go ahead. I think there's two parts to what you said. You said, you know, what is the value? The value is vindicating the purposes of the act because the order... The purpose of the act is to get, in this case, is to get a permit, correct? And the purpose is that there is no permit, but all that waste is there. This is a permit violation. Can anybody get a retroactive permit for this site to allow what happened in the past to be now sanctioned through the permit process? No, because in 2012, the legislature said no more permitted landfills in Cook County. Your question, your previous question, had two parts to it. What was the point of this, this type of mandatory injunction order? No, no, no. If a mandatory injunction issues, that is impossible to perform. Is that something that is enforceable? Why wouldn't a hearing with alternative suggestions as to what the remedy would be, why wouldn't that be the proper way to or the more appropriate way to see whether this $100 million problem could be resolved in a different fashion? We would say that the proper way to handle this and why the mandatory injunction order is appropriate is because removal is the correct remedy. It's the remedy that is warranted by the statutory purposes. It takes into account that the order is not just binding on these individual parties. It's notice to other people who are subject to the act of what is required and expected of them. So having removal as the order, that can't happen. What if removal is impossible? If they're saying that they just absolutely cannot do this, I would say that is not a reason not to enter this order. That is the reason why down the road they can go back to the circuit court, which has continuing jurisdiction over this, and say, we just can't do this, and here's what we think should happen. That would happen at that juncture down the road, but it does not mean that the removal order is inferred anyway or shouldn't have been entered, because the removal order is needed to provide a complete remedy to vindicate the purposes of the act, which are to restore the environment. But how do you respond to the operator's contention that it actually would be, and if I'm misquoting here, I don't mean to, it would be a detriment to the environment to remove it? Yes, they did say that. I think that is just another way of saying, though, that we should be excused from doing anything. It's overlooking that this is a managed undertaking. That point was made earlier, that this is all happening under the supervision of the Illinois Environmental Protection Agency and the continuing jurisdiction of the court. So those are implementation issues. They have to submit a plan, and then get it approved. You're not going to be allowed, if that's contemplated, that they would start this in some way that is environmentally irresponsible. Those are implementation issues that can be dealt with. What you were saying was to stop people from doing it in the future. Wouldn't these fines be a bit of a detriment if somebody's out to do this, as opposed to removing a hill that they're claiming would be environmentally not warranted? I'm sure the fines would get some of the attention, but nonetheless, removal is very important here to provide a complete remedy. Otherwise, it is sending the message that all you have to do is just make a really big mess, violate the statute in a big way, and you can be excused by the court from having to clean it up. So we feel that removal is absolutely the appropriate remedy to be ordered here in order to vindicate the purposes of the act and send the proper message to others, and that any of these details, including claims about feasibility or how to go about it, can be addressed in the implementation phase and modified if necessary, and that that is the proper stage to do this, and not at the stage of saying that there's a problem with the injunction order itself. But you promised that with anybody can make a really big mess, but the argument that the operator is this isn't a big mess. Maybe it's even an asset to the community. I don't know, but anyway, so that's my point, is are we removing something that we're better off leaving? Is the result here another negative on top of all of these negatives in these 18 years of negatives? We absolutely do not agree with the characterization that somehow putting a huge pile of illegal waste on the site is somehow an asset to the community, and the idea that because this is not hazardous, somehow it is not a serious violation is absolutely not the case. That ignores a permit isn't just a piece of paper. It is a commitment that involves a whole regulatory scheme that was to take place before this ever started. There was supposed to be signing approval with the community's input. They were supposed to operate in a certain way. There was supposed to be financial assurance so that they put money aside so that we wouldn't be in a situation like this. They're supposed to provide expenses after here. That never happened, and so it's a serious violation in itself that both warrants the injunctive relief and the substantial penalties. On that exact point, the people were aware of this dumping in 2002, correct? That's when the dumping started, yes. Right. People had the ability to enjoin further dumping in 2002, correct? Well, the agency didn't have the ability to order an injunction. The agency said that violation notice was saying you must stop this. But the attorney general's office had the wherewithal to move the circuit court to issue an injunction prohibiting dumping further material at this site. Did they not? The case, we did. The enforcement action followed. You did not ask for injunctive relief, a temporary injunction to stop this dumping for how many years? Five or eight? That is a point that's raised, and I don't believe that that is true. How many years? Were you aware of this dumping before the dumping stopped? Five or seven or eight years? There was an enforcement action seeking to stop the dumping. And the state never moved to enjoin further dumping during that period, correct? So the dump went from ground level to 85 feet up in the air without the state ever moving to stop the dumping. Is that correct? No. It's not correct because there was initially a preliminary injunction motion that the state had on file that seeking a preliminary injunction to stop the dumping that was vigorously opposed by the operators as requiring substantial discovery on that point, saying that there were many facts questioned. And in view of that, I think what the record reflects is a lot of pushback and recalcitrance by the operators and prolonging that discovery. The people eventually brought a motion for partial summary judgment on the issue of the waste so that they would get ammunition to say, you're saying there's factual issues, operators, but this is really the only legal issue. That's a long-winded answer saying, but we never sought the injunction. We never asked the court to issue a temporary or permanent injunction all during this period. You never moved the court to do that. You may have engaged in discovery. You may have been professional and cooperated with opposing counsel, but you never stopped the dumping. And you could have. Could you not have? I think I would have to say that that involves a lot of hindsight and trying to characterize the record in a way that is favorable to the operators and the owners, and that the bottom line there is nothing about the course of the litigation, which I think comes through from reviewing the record, would warrant excusing them from their violations and the remedy of removal at the site. And I'd like to say one other point about attempting to stop, because in 2005, the agency did issue a seal order prohibiting further dumping. And the operators went into court and had that seal order reversed by the Pacific Court. By whom? By the Pacific Court. Okay. And who did that? Do you recall? The Pacific Court judge at the time? Yeah. That was... Huh? Judge Quinn. Oh, Judge Quinn? Yeah, I did see that. I think it's been through a lot of judges. Yeah, right. Okay, that's all I have. Okay. I have just one question. What's your response to Mr. Prendergast's argument with regard to their responsibility zoning that's 20% that occurred after 2004? Thank you, because I am a bit out of my time, and I haven't had a chance to address the retroactivity issue, which is the last kind of legal question that's come up. First of all, they... It's not another 12 feet. And the exhibit that they're pointing at is trying to kind of skew those numbers. At least half of this dumping occurred after the Illinois Supreme Court's decision in Einholder. And I think that the way this was discussed with respect to the retroactivity issue has got it exactly right. That in July 2004, when this amendment took effect, allowing amendments for injunction, the operators had every opportunity to stop dumping at that point. And they did not. They chose to continue. So these violations continued well beyond the amendment, and that makes the case different from the Einholder situation. And because there are continuing violations here, the appropriate remedy becomes removing the entire waste pile, because this is one big differentiated pile. Undifferentiated pile. And as I said, substantial violations of the dumping and additional violations occurred well after 2004. So retroactivity should not be an impediment here. To the extent that... Let me ask you on the retroactivity. At this site, let's assume, for the sake of my question, that there was one pile from 2002 to 2004. And at the other end of the property, same property, same operator, same owner, there was a second pile. And that pile was from 2004 to 2007. Okay? Would you agree that the retroactivity argument is in favor of removing the second pile, but not the first pile, because the first pile was there before the amendment? In my hypothetical. Well, I would say, if they continued the activity, and it's at least still the same site, that makes it a different case than Einholder. But I think this is an easier case, because there is one undifferentiated pile. And also, some of the violations... So you don't want to execute a hypothetical? Well, I would take the position that even in your hypothetical, all of the piles should be removed if it's the same site. Thank you. Also, the nature of some of the violations, the Section 21E and 21A, those are geared towards... Those are ongoing, because those are more specifically geared towards the presence of waste at the site now. So, there's no question that those are ongoing violations, which also makes this different than the Einholder case. So, we feel that the injunction order should be affirmed as consistent with the law, and consistent with the purposes of the Act. And an appropriate remedy that was not just a rubber stamp, but based on the Act and the detailed plan that the people put before the court when there were no other detailed plans assessed. Thank you. Thank you. Mr. Deeb? Your Honor, just a few points I want to make in rebuttal. First, on the question of penalties, of never having asked for a hearing on penalties, we addressed that in detail in page 13 and 14 of our reply. We lay out very clearly that we were asking for a trial both on the remedy and on the penalties, and our rationale was that's exactly where we were in January of 2011, before this went up on appeal. On the question of the issues that would be raised at trial, I addressed that. I give you some specific examples, Your Honor. In my September 17, 2018 response, which I quote at length at page 13 of my reply brief, we lay out examples of issues and evidence that we would have put in to trial. In our opening brief at page 23 to 24, I give quite a list of the issues that we would have addressed at trial. Going to Justice Pierce's point, and many of the justices asked this question about the practicality of spending $100 million to solve a problem that doesn't present an imminent threat to the environment and public health, I would draw your attention to Section 42E of the Act. We're not just dealing with the statute authorizing an injunction, prohibitory or mandatory. Later on in 42E, it says, when necessary to address violations of the Act, and we addressed that in our December 28, 2010 response to the court, to the circuit court, and refer to that document, that brief at page 3501 of the record, where we analyze not only the Rosenwinkel balancing of equities issue, but we say separate and apart from that, you have to look at whether the excavation of this pile is necessary to address the violation of the Act. We haven't discussed that this afternoon, but I believe that that is critical. It's the discretion of the court. You have to make a finding that this is necessary. It's not just simply the attorney general coming in and saying, there's been a violation, and you have the authority to abate by a prohibitory or mandatory injunction. Done. It's not that simple. You have to look further down and examine whether that is necessary, whether we should invoke the power of equity to address this violation. Those are my only points here. Thanks very much. Mr. Pernodgas? Thank you, Your Honor. I have in my hand the people's proposed order for injunctive relief. Actually, what I have in my hand is the order that was entered on May 17, 2008, in this case. The only difference between the people's proposed order for injunctive relief and the order that Judge Atkins signed, he scratched out the words people's proposed, and then he signed it. The idea that there was some kind of back and forth in what counsel has referred to as a paper hearing, which is new to me. You have a hearing, you have a hearing. It's just not what went on here. You know what, I'm not criticizing Judge Atkins as much as it sounds. Because I think Judge Atkins actually thought that he didn't have any choice, that he had to take whatever the state handed him, and that by virtue of this court's opinion, he had to remediate by ordering remediation by the parties by removing the hill. That's apparently what he believed. We never had a chance to litigate that issue. But in point of fact, that meant we never had a chance at a hearing where witnesses are cross-examined, where experts are brought in to determine the feasibility of this project. And if it's not feasible, if it can't be done, then it cannot be the subject of an order. And beyond that, my only other response, going back to retroactivity, and I know there's a number of issues we raised in our briefs, but I know the court has read those briefs. The only other point I would go back to retroactivity is that I regret that I had not come up with Judge Pearson's hypothetical of the two hills. Because that nails it. The first time you ever agreed with me. We'll get into that. But there is really no difference between building two hills side by side on that site and building the second hill on top of the first one. The first one is exempt from mandatory injunctive relief because it's being applied retroactively to that conduct. And I understand your concerns, Judge Hyman, and your questions on that subject, but I do believe that you cannot do that. And then the corollary to that is, and I don't even think the Attorney General or the EPA would favor the idea of taking the first 10 or 12 feet off the top of that hill. That's the cap of the hill. That's what keeps everything in place. When it rains, when it snows, there's trees, there's bushes, there's foliage. There's everything you need to cap that hill. I don't think the Environmental Protection Agency would be in favor of that. And finally, subject to any questions you may have, I want to conjure up a hypothetical that I regret having to raise. And that is that Mr. Einolder drops dead tomorrow. Does anybody here think for a New York minute that the Environmental Protection Agency, recognizing that there's nobody else that can get the job done, is going to go to the legislature, ask for $100 million, and remove this hill? They know full well, the Attorney General knows full well, that this hill has no environmental downside. It is not toxic. It is not hazardous. It is not even the environmental blight that's referred to in the Attorney General's brief. They don't characterize it as such, but they do say that that's one of the purposes of getting a permit is so you can avoid that. Well, it didn't turn out that way. It turned out to be a perfectly benign, non-toxic, safe hill. And by the way, it's within the jurisdiction of Ford Heights. In our 308 appeal, when we were making the argument that this was the superstructure for a recreational facility and was exempt from the permit requirements of the statute, we weren't the only ones before this court. We were joined by Ford Heights. This was a significant source of income for Ford Heights, clearly one of the poorest communities in the state of Illinois. And we were doing something there in good faith, because we certainly believe that we fit within the exemption. We were ruled, we did not win that rule, but it was a good faith, it was a sufficiently good faith finding that we got a 308 appeal out of it. Because they had to make a, the judge had to make a finding that there was a reasonable basis for, or it was a basis for reasonable minus to differ. We've covered that in our brief. But the, and then this court exercised its discretion and took that appeal. So this idea that, you know, there was some terribly improper environmentally dangerous motive here, is not this case. It's not this case. And that goes to the last point, which is what harm would befall anybody if you left it right where it is? And the answer is that the Environmental Protection Agency, and I don't entirely blame them, but let's understand what they want. They don't want that hill down, or they would take it down. They want a Pyrrhic victory. They want to win this one. Maybe they want to win it for the next case they're going to hear. I don't know. But the next case hopefully won't be one where the injunctive relief they're seeking is impossible. Because you, I don't think this court wants to render an opinion that says, go do something that's impossible. And finally, on the issue of fines, I reiterate, these fines are out of line with precedent, with most cases in this area. And it should be remanded to revisit the excessiveness of the fines. Although I have to tell you, $6 million or $1 million, unless I'm being woefully misinformed, my client doesn't have that kind of debt. Much less refusing it to remove the hill. I appreciate the court's time on behalf of my clients. Thank you very much. All right. Thank you all very much. Very, very good job. Interesting case. We'll be taking it under advisement.